I. NEEL CHATTERJEE (STATE BAR NO. 173985)
nchatterjee@orrick.com
JULIO C. AVALOS (STATE BAR NO. 255350)
javalos@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:     +1-650-614-7400
Facsimile:     +1-650-614-7401

THOMAS J. GRAY (STATE BAR NO. 191411)
tgray@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza
Suite 1600
Irvine, CA  92614-2558
Telephone:     +1-949-567-6700
Facsimile:     949-567 6710

Attorneys for Plaintiff
FACEBOOK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC., | Case No.  5:08-cv-03468 JF |
| Plaintiff, | **FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR** |
| v. | |
| STUDIVZ LTD., HOLTZBRINCK NETWORKS GMBH, HOLTZBRINCK VENTURES GMBH, DENNIS BEMMANN, MICHAEL BREHM, AND DOES 1-25, | 1.  **VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. SECTION 1030;** <br> 2.  **VIOLATION OF CALIFORNIA PENAL CODE SECTION 502;** |
| Defendants. | 3.  **TRADE DRESS INFRINGEMENT, 15 U.S.C. SECTION 1125;** <br> 4.  **BREACH OF CONTRACT;** <br> 5.  **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** <br> 6.  **TORTIOUS INTERFERENCE;** <br> 7.  **CALIFORNIA COMMON LAW MISAPPROPRIATION;** <br> 8.  **CIVIL CONSPIRACY.** |
| | **DEMAND FOR JURY TRIAL** |

Dockets.Justia.com

1      Plaintiff Facebook, Inc. ("Facebook") alleges against Defendants StudiVZ Ltd.

2  ("StudiVZ"), Holtzbrinck Networks GmbH ("HNG"), Holtzbrinck Ventures GmbH ("HVG"),

3  Michael Brehm, Dennis Bemmann and Does 1-25 inclusive (collectively, "Defendants"), as

4  follows:

5                      **INTRODUCTION**

6      1.     This is a case to stop Defendants from running a knockoff of Facebook's website.

7  StudiVZ.net, launched a year and a half after the debut of Facebook.com, was built by copying

8  Facebook's look, feel, features and services.  StudiVZ's founders have publicly admitted as

9  much.  Capitalizing on its theft and Facebook's success, StudiVZ has quickly expanded from its

10  native Germany to many other nations throughout Europe.   StudiVZ's success is due to its theft

11  and misuse of Facebook's intellectual property.  This was known to Defendants Holtzbrinck

12  Networks and Holtzbrinck Ventures when they invested more than one hundred million dollars in

13  StudiVZ, obtaining full control of the company and the right and ability to control and conduct its

14  affairs.  The Holtzbrinck Defendants invested knowing of StudiVZ's infringement, and after

15  obtaining operational control of the company, directed the company to continue its willfully

16  infringing course in order to preserve its substantial investment.  Defendants continued their

17  willful infringement knowing that it was harming Facebook in California.

18      2.     StudiVZ does not and cannot provide the same level of quality user experience as

19  Facebook, and Facebook has no ability to control StudiVZ's user experience.  Because StudiVZ

20  looks like Facebook and incorporates nearly identical features and functionality to Facebook,

21  users have and will continue incorrectly to believe that StudiVZ is associated with Facebook.

22  Facebook does not want the goodwill it has worked so hard to build to suffer because of the

23  failure of StudiVZ to adhere to the same standards of quality, privacy and service as Facebook.

24  Facebook, therefore, seeks to end StudiVZ's illegal activity to ensure that users are not confused

25  and that Facebook's reputation remains unharmed.

26  ///

27  ///

28  ///

- 1 -

3.     Facebook, Inc. is a Delaware corporation with its principal place of business at 156 University Avenue, Palo Alto, California.  Facebook operates all of its servers in and/or from California and has done so since June 2004.

4.     Plaintiff is informed and believes and thereupon alleges that Defendant StudiVZ Ltd. is a German entity headquartered at Saarbrucker Str. 38, D-10405, Berlin, Germany. StudiVZ operates numerous websites, including StudiVZ.net, MeinVZ.net, and a number of versions of the StudiVZ site translated into various European languages.

5.     Plaintiff is informed and believes and thereupon alleges that Defendant Holtzbrinck Networks GmbH ("HNG") is a German entity headquartered at Bayerstrade 21, 80335, Munich, Germany.

6.     Plaintiff is informed and believes and thereupon alleges that Defendant Holtzbrinck Ventures GmbH ("HVG" or, collectively with HNG, the "Holtzbrinck Defendants") is a German entity headquartered at Bayerstrade 21, 80335, Munich, Germany.

7.     Plaintiff is informed and believes and thereupon alleges that individual Defendant Michael Brehm is a German citizen residing in Berlin, Germany.  In addition to serving as Defendant StudiVZ's Chief Operating Officer since June 2006, Mr. Brehm is often credited as being one of StudiVZ's "founders."

8.     Plaintiff is informed and believes and thereupon alleges that individual Defendant Dennis Bemmann is a German citizen residing in Berlin, Germany.  Mr. Bemmann is one of the "founders" of StudiVZ and is believed to have been the primary force behind its programming and the wholesale copying of Facebook.

9.     Plaintiff has not yet fully and independently identified the true names and capacities of the Defendants sued herein as Does 1-25, inclusive, and therefore sues those Defendants by such fictitious names.  Plaintiff reserves the right to amend this complaint to allege such Defendants' true names and capacities when they are ascertained.  Plaintiff is informed and believes and thereupon alleges that each of the fictitiously designated Defendants was a participant in the acts alleged herein,  such that each is jointly and severally responsible for the

acts and omissions complained of herein.

**JURISDICTION AND VENUE**

10.     This is a civil action for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the Lanham Act, 15 U.S.C. 1125 et seq., California Penal Code 502(c), breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract, common law misappropriation and civil conspiracy.

11.     The Court has jurisdiction over the Computer Fraud and Abuse Act and the Lanham Act claims pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

12.     During all relevant times herein, Facebook, Inc. has operated its websites, www.thefacebook.com and www.facebook.com, from servers and offices located in California. Facebook is informed and believes that Defendants were and are aware that Facebook operated its business from California during all relevant times herein.

13.     During all relevant times herein, Defendants have repeatedly and intentionally accessed Facebook servers located in California.  *See* Cal. Penal Code § 502(j).  Defendants have maintained systematic and continuous contacts with California while engaging in the acts described in this complaint.  During all relevant times herein, Defendants had to be aware that their wrongful acts would harm Facebook in California.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1391(c).  On information and belief, the wrongful acts causing injuries were initiated at various times from the United States (possibly even California), Germany and other locations directed at persons and equipment in the County of Santa Clara, California. Therefore, the causes of action arise and the harm inflicted occurred primarily in the County of Santa Clara.

15.     Finally, through their use of Facebook's website and service and their direct or indirect use of registered Facebook User's accounts, Defendants have consented to venue and jurisdiction in the state and federal courts of California.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS.

## FACEBOOK

16.    Facebook operates the most trafficked and most successful social utility website in the world.  Originally founded by Mark Zuckerberg in 2004 while he was a student at Harvard University, Facebook has since become the social networking site of choice among virtually every demographic of internet user over the age of 13.

17.    To use Facebook, a user must first create a personalized webpage or "profile."  A profile can describe as much or as little about the user as the user wishes.  The information that a user can place on a profile includes his or her name, college, marital status, interests, favorite books, music or hobbies, profession, country of origin, college major and the like.  A typical user will insert personal information and content such as personal descriptions, photographs, email addresses, comments and content relating to their interests, as well as communications with other users.  An example of a profile page is attached as **Exhibit 1**.

18.    Having created a profile, a user may then use the features of the site.  The user can link their profile to those created by "friends," i.e., other Facebook users that are known to the user or that share the same interests.  Once users link profiles, they may begin to interact with one another using the numerous communication features Facebook provides.  For example, a user can "poke" a friend, that is, send a message to another user to get their attention.  Users can communicate via chat, internal messaging or posted messages.  Users can view feeds and streams of information and comment on other users posts.  In addition, users can join groups organized around an interest or political cause.  The user may join networks organized by city, workplace, school, and region to connect and interact with other people in those groups or networks.  The user may also use a host of applications available on the Facebook platform.

19.    The privacy controls of Facebook create a unique value-add for Facebook that has been an important point of differentiation from other websites.  Unlike other websites, users identify their own names and personally identifying information, such as email addresses.  However, access to profiles is limited only to those that a user gives access to, i.e., a "friend."  Even when a "friend" is given access, the profile creator is empowered to limit what that

particular "friend" is able to see.  These privacy controls create a safer and more trustworthy environment for users of the Facebook service.  These controls have contributed substantially to Facebook's success and goodwill.

20.     In addition to its privacy controls, Facebook has expended significant resources and gone to great effort to create a service that excels in creativity, functionality, originality, and that provides users with an optimal experience.  Its success can be attributed to the unique look and feel of its website and user interface, the accompanying functionality to navigate the website and the privacy controls.

21.     The look and feel of Facebook is made up by a variety of carefully designed components, some of which are more obvious to a typical user than others.  For example, Facebook features include the ability to "poke" another user or to write on another user's "wall," a kind of message board.  Facebook's "Search" feature allows users to search for and connect with friends and acquaintances with whom they have lost touch.  Facebook provides feeds or streams that allow users to keep updated on the activities and information shared by their friends.  Other components of Facebook's design, look and feel are more subtle.  For example, Facebook has honed the font that is used on its site, the size and location of text, the size and location of uploaded pictures, the features that it offers, the location of hyperlinks for those features, and the location of advertisements and other banners.  Facebook has planned where user-posted messages are viewed on a webpage, what particular designs are to be used, as well as the use of certain graphics, pictures, video, information, applications, music, sound and other files and their selection and arrangement on the Facebook site.  Each and every one of these components culminates in a unique user experience.  As discussed above, Facebook has also put into place privacy controls allowing users a multitude of options to choose from to protect their data.  The user is given more freedom to control what other users can see.

22.     All aspects of the Facebook website, services and data are maintained on Facebook's computer servers located in or controlled from California.  These computers are owned and operated by Facebook, and access to them is restricted under Facebook's Terms of Use.

**FACEBOOK TERMS OF USE**

23.     Anyone who accesses or uses Facebook's website at www.facebook.com must signify that they have read and agree to be bound by Facebook's Terms of Use, whether or not they are a registered member of Facebook.  Although there have been slight changes made to the Terms of Use from 2004 to the present date, each iteration has remained substantively the same. *See* attached **Exhibit 2**, collecting pertinent excerpts from the Terms of Use in place for the years 2004, 2005, 2006 and the present date (the full Terms of Use currently in place are available at http://www.facebook.com/terms.php.)  Unless otherwise noted, citations to the Facebook Terms of Use are drawn from the Terms effective as of June 28, 2005.

24.     Only those individuals who agree to Facebook's Terms of Use are authorized to access or browse Facebook's website, thereby becoming a User. If a person fails to agree to the Terms of Use, that person will be unable to pass beyond the log-in page attached as **Exhibit 3**.

25.     Accordingly, all users of the Facebook website, whether registered or unregistered, agree under the Facebook Terms of Use not to copy Facebook's site content, not to use it for commercial purposes and, users agree that the Facebook service and website are available only for personal, non-commercial use. Users acknowledge that acting in a contrary manner constitutes a violation of the terms of the agreement.

26.     In pertinent part the 2005 Terms of Use provided:

> You understand that the Web site is available for your personal, non-commercial use only.  You agree that no materials of any kind submitted through your account will violate or infringe upon the rights of any third party, including copyright, trademark, privacy or other personal or proprietary rights; or contain libelous, defamatory or otherwise unlawful material. You further agree not to harvest or collect email addresses or other contact information of members from the Web site by electronic or other means for the purposes of sending unsolicited emails or other unsolicited communications. Additionally, you agree not to use automated scripts to collect information from the Web site or for any other purpose. You further agree that you may not use Web site in any unlawful manner or in any other manner that could damage, disable, overburden or impair [the Facebook] Web site.
>
> …

All content on Web site, including but not limited to design, text, graphics, other files, and their selection and arrangement (the "Content"), are the proprietary property of Thefacebook or its licensors. All rights reserved. The Content may not be modified, copied, distributed, framed, reproduced, republished, downloaded, displayed, posted, transmitted, or sold in any form or by any means, in whole or in part, without Web site's prior written permission. You may download or print a copy of any portion of the Content solely for your personal, non-commercial use, provided that you keep all copyright or other proprietary notices intact. You may not republish Content on any Internet, Intranet or Extranet site or incorporate the information in any other database or compilation. Any other use of the Content is strictly prohibited. All trademarks, logos, trade dress and service marks on the Web site are either trademarks or registered trademarks of Thefacebook or its licensors and may not be copied, imitated, or used, in whole or in part, without the prior written permission of Thefacebook.

27.     By assenting to Facebook's Terms of Use, Facebook users also "consent to, and waive all defenses of lack of personal jurisdiction and forum non conveniens with respect to, venue and jurisdiction in the state and federal courts of California."

28.     Facebook requires its users to agree to the site's Terms of Use and related privacy policies so that, among other reasons, it can ensure the protection of users' private information. Given the nature of the Facebook service and the often personal nature of the information that Facebook users post to their profiles, Facebook has invested significant resources in developing its privacy protocols and in making the Facebook experience a safe one for all of its users.

**STUDIVZ CREATES A WEBSITE THAT ADMITTEDLY COPIES FACEBOOK**

29.     The success of Facebook's interface and design has given rise to efforts by others to capitalize on the significant investment made by Facebook. These people and organizations seek to inappropriately associate themselves with Facebook and its substantial global goodwill. StudiVZ operates just such a copycat website, perhaps the largest of its kind.

30.     The Facebook website and service launched in February 2004 on the Harvard University campus. Within months, it had become a nationwide phenomenon. In June 2004, Facebook relocated to Palo Alto, California, where it has remained ever since. By summer 2005, Facebook had grown to well over six million users.

31.     Around this same time, upon information and belief, two German university students traveled to the United States on internships.  The first, Ehssan Dariani, worked at a start-up company named Spreadshirt, Inc., which maintains offices in Boston, Massachusetts and Greensburg, Pennsylvania.  In addition to working at his internship, Mr. Dariani admitted that while in the United States, he was "looking for the next big thing."  *See* attached **Exhibit 4**.

32.     Upon information and belief, as part of his internship at Spreadshirt, Mr. Dariani was tasked with spending $100,000 in marketing and advertising funds on the ascendant Facebook.  As Mr. Dariani has publicly admitted, "When I saw student networks in the USA, I wanted to have that in Germany."  *See* attached **Exhibit 5**.  While in the United States, upon looking at Facebook for the first time, Mr. Dariani has admitted to thinking, "Wow, super, it's a lot of fun.  I want to have that too, there's no such thing in Germany."  *Id*.  According to Mr. Dariani, "That's when I thought, 'That's good, adopt it, do it.'"  *Id*.

33.     Upon information and belief, shortly thereafter, Mr. Dariani contacted his friend, Dennis Bemmann, and the two conspired to steal Facebook's look, feel, features and functionalities in order to develop their own infringing company and website, StudiVZ Ltd. and www.studivz.net.

34.     Mr. Bemmann, a young computer programmer from Germany, was also in the United States working on an internship.  Mr. Bemmann worked for a San Jose, California-based technology company named Xilinx, headquartered less than 25 miles from Facebook headquarters.  According to the International Herald Tribune (the international arm of the New York Times), as an intern for Xilinx, Mr. Bemmann "helped to design Internet routing equipment in Colorado and California."  *See* attached **Exhibit 6**.  Upon information and believe, Mr. Bemmann worked for Xilinx in 2005.

35.     StudiVZ has since admitted that it was during this time, "in 2005," that StudiVZ first learned that Facebook resided in California.  *See* attached **Exhibit 7**.  Upon information and belief, it was also during this time that Messrs. Dariani and Bemmann began to gain access to Facebook in order to copy Facebook's intellectual property.

36.     Upon information and belief, at the end of their internships in 2005, Messrs. Dariani and Bemmann traveled back to Germany and continued to access Facebook's servers in order to copy Facebook's look and feel.  Upon information and belief, both Mr. Dariani and Mr. Bemmann joined Facebook and agreed to Facebook's Terms of Use.  Within months Messrs. Dariani and Bemmann received initial financing and developed and launched www.studivz.net, a competing social networking site that looked nearly identical to Facebook.  *See* attached **Exhibits 8 and 9**.  Upon information and belief, the StudiVZ site launched on or about October 2005.  A few months later, in May 2006, individual Defendant Michael Brehm joined StudiVZ and later became its Chief Operating Officer.  Mr. Brehm is often credited as being one of StudiVZ's "founders" and, upon information and belief, has, knowingly and intentionally contributed, aided and expanded StudiVZ's infringement of Facebook's intellectual property.

37.     Also in 2006, an American student named Taylor Mingos joined StudiVZ's executive team.  According to Mr. Mingos's biography at his new U.S.-based company's website, Mr. Mingos "helped grow StudiVZ.net, an apartment-based start-up in Berlin, into a major European Internet presence."  *See* attached **Exhibit 10**.  Upon information and belief, Mr. Mingos has since returned to the United States and now resides in North Carolina.  *See* attached **Exhibit 11**.

38.     Mr. Mingos was joined at StudiVZ by another student named Tobias Walter, who now works as Chief Financial Officer and Chief Operating Officer for Mr. Mingos's North Carolina-based company, Shoeboxed.  According to Mr. Walter's biography on the Shoeboxed website, Mr. Walter was the "VP [Vice President] [for] International Markets for studiVZ.net, where he led the roll out of the product to eight foreign markets with a multi-million-Euro budget."  *See* attached **Exhibit 10**.  This budget was provided by the Holtzbrinck defendants, who knowingly financed, aided, and contributed to StudiVZ's ongoing and expanding infringement of Facebook's intellectual property.  *See* ¶ 53, *infra*.  Upon information and belief, Mr. Walter has since moved to the United States and now resides in North Carolina.  *See* attached **Exhibit 12**.

39.     Upon information and belief, after the launch of the initial version of the StudiVZ website, StudiVZ entered into a contract with the United States-based company Intetics

Corporation ("Intetics"). According to its website located at www.intetics.com/contact.html, Intetics is headquartered at 809 Ridge Road, Suite 205 in Wilmette, Illinois. *See* attached **Exhibit 13**. Intetics represents itself as being "a global outsourcing company focused on custom application development, software testing, web system design and offshore staff augmentation services." Upon information and belief, U.S.-based Intetics, on its own or through its employees and agents, continued incorporating stolen Facebook intellectual property into StudiVZ's website and service at StudiVZ's direction. *Id.*. Intetics still lists StudiVZ as one of its "major clients." *Id*.

40.     StudiVZ is an abbreviation of the German term *Studentenverzeichnis* or *Studienverzeichnis*, which means "students' directory." Translated, it bears the same meaning as the United States idiom "facebook," which is a colloquial term used to describe a student directory.

41.     StudiVZ has stolen not only Facebook's features, but also its look, its feel, its design, much of its website functionality, and other proprietary intellectual property such as style sheets. A comparison between pages of Facebook and StudiVZ show that the websites are virtually identical. *See* attached **Exhibits 8** and **9**.

42.     The similarity between the sites is not coincidental. Mr. Dariani, one of StudiVZ's co-founders, has admitted to using the Facebook website to create the StudiVZ website. Upon information and belief, StudiVZ executives and managers regularly instructed their employees to join Facebook and create Facebook user accounts for the purpose of regularly copying Facebook's features and monitoring Facebook's developments and innovations. Upon information and belief, this instruction was sometimes provided as early as the initial interview with a potential new hire. Upon information and belief, designers and developers at StudiVZ were instructed, as part of their regular employment tasks, to keep tabs on Facebook and to copy and implement new features that they felt would "work" on studivz.net.

43.     Mr. Dariani himself has admitted, "[w]e may have oriented ourselves along the lines of the Facebook layout." *See Der Spiegel* (stating "Dariani is not afraid to admit that his site is based on the American predecessor.") (Article available online at:

1  (http://www.spiegel.de/international/0,1518,druck-446353,00.html).

2      44.     But Defendants did much more than simply "orient" the StudiVZ site along

3  Facebook's layout.  The StudiVZ sites evince the blatant, unabashed and wholesale theft of

4  Facebook's user interface and webpage designs.

5      45.     As on Facebook, a StudiVZ user first creates a profile.  The information requested

6  from a user when they are creating their profile is substantially identical to that requested by

7  Facebook.  Indeed, the profile creation web pages contain many of the same questions in the same

8  order that Facebook's site does, arranged in substantially identical drop-down and side menus.  In

9  both services, once a profile has been completed, a user is taken to their profile page.  The

10  following features bore an unmistakable resemblance to Facebook:

11      ● A StudiVZ profile page is graphically broken up into a number of distinct frames.

12          *Compare* attached **Exhibit 8**, a StudiVZ profile page, with attached **Exhibit 9**, a

13          Facebook profile page.

14      ● The StudiVZ profile page featured the company logo and/or name in the upper left-

15          hand corner of the page.  *Compare* attached **Exhibit 8** with attached **Exhibit 9**.

16      ● Below the company logo, the StudiVZ profile page features a "Search" function,

17          which allows users to search for other users on the site.  *Compare* attached **Exhibit 8**

18          with attached **Exhibit 9**.

19      ● Below the "Search" bar the StudiVZ profile page has a vertical column of hyperlinks

20          to website features and applications.  *Compare* attached **Exhibit 8** with attached

21          **Exhibit 9**.

22      ● The StudiVZ profile page features a frame across the top that includes links to various

23          pages on the respective site.  *Compare* attached **Exhibit 8** with attached **Exhibit 9**.

24      ● The StudiVZ hyperlinks include links, among others, to a user "Photo" page and a

25          user "Groups" page.  *Compare* attached **Exhibit 8** with attached **Exhibit 9**.

26      ● Below these links StudiVZ features a small frame in which to include banners or

27          advertisements.   *Compare* attached **Exhibit 8** with attached **Exhibit 9**.

28      ● To the right of the advertisement frame is a large, square space into which a user may

- 11 -

insert a picture of themselves. *Compare* attached **Exhibit 8** with attached **Exhibit 9**.

- Below the personal picture, the StudiVZ site features hyperlinks that allow a user to upload and update their photo. *Compare* attached **Exhibit 8** with attached **Exhibit 9**.

- Below these links is a small frame that lists a user's friends. *Compare* attached **Exhibit 8** with attached **Exhibit 9**.

- To the right of the personal picture is a frame listing the user's personal information, which on both sites includes the user's name, date of site membership and other contact information. *Compare* attached **Exhibit 8** with attached **Exhibit 9**.

- Below this area on Facebook is a frame called "The Wall," which displays public messages written by friends meant to be read by all visitors to a user's profile page. *Compare* attached **Exhibit 8** with attached **Exhibit 9**. StudiVZ has an identical frame in an identical location whose name translates to "The Board," which performs an identical function to "The Wall" in Facebook. *Compare* attached **Exhibit 8** with attached **Exhibit 9**.

- The StudiVZ "Search Results" page, an example of which is attached hereto as **Exhibit 14**, is virtually identical to a similar page on Facebook, attached as **Exhibit 15**.

- The StudiVZ website has also copied the format as well as certain elements of Facebook's privacy controls, including Facebook's emphasis on its "core principle" that users "should have control over [their] personal information." *Compare* attached **Exhibit 16** with attached **Exhibit 17**.

46.    In addition to copying the design of profile pages and virtually every other key webpage from Facebook, Defendants have stolen numerous other aspects of the Facebook service. The protocol to communicate with other users is substantially identical in both sites. In both sites, a user may search for and join a group by substantially identical means. Once a user navigates to a Group profile page, the emblematic image of the group is situated in the upper right hand corner of the page, despite the fact that individual user profiles situate the user's image in the upper left hand corner. *Compare* attached **Exhibit 18**, a StudiVZ "Group Profile" page, with

attached **Exhibit 19**, a Facebook "Group Profile" page.

47.     StudiVZ also appears to have "style sheets" that specifically call out to Facebook designs, using such file names as "myfb" and "myfacebook."  In addition, both *Der Spiegel* and the online media have uncovered StudiVZ website error messages that speak to StudiVZ's awareness that it was copying Facebook's intellectual property.  A screenshot of these error messages is attached hereto as **Exhibit 20**.  Other online watchdogs have discovered that StudiVZ's programmers named one of their programming folders "Fakebook," an explicit reference to Facebook and an apt—and incriminating—self-description by StudiVZ of its own website.  *See* http://www.spiegel.de/fotostrecke/0,5538,PB64-SUQ9MTY2ODMbbnI9Ng_3_3,00.html.

48.     Any differences between the StudiVZ sites and Facebook are nominal.  Most obviously, Defendants have replaced Facebook's blue color scheme with a red one.  In addition, the *Der Spiegel* article cited above noted that other than some minor changes between Facebook and StudiVZ, "the differences are in name only.  For example, in Facebook users can 'poke' one another; on StudiVZ, Dariani coined the term 'gruscheln'[1] – a popular word among users, but the function is nonetheless identical to the 'poke.'  Mr. Dariani has stated that he wanted to avoid 'mindless Anglicisms,' and hence the site's nomenclature is 'strictly German.'"

49.     Mr. Dariani's and Defendants' eschewing of "mindless Anglicisms" demonstrates that they worked backwards from the Facebook service, copying everything first, and then doing away with items that would not resonate with or translate to a German-speaking audience, such as an American idiomatic term like "poke."

50.     Defendants' theft of Facebook's intellectual property has not gone unnoticed by its users or members of the media.  Attached as **Exhibits 21** through **24** are printouts of websites that alternatively refer to StudiVZ as a "Facebook clone," *see* **Exhibits 21** and **22**, an example of

---

[1] The *Urban Dictionary*, an online dictionary of American and foreign slang founded in 1999, defines "gruscheln" as, "A German/Austrian made up word that is a mix between the word *gruessen* (meaning 'greeting someone') & *kuscheln* (meaning 'to hug someone')."  The *Urban Dictionary* notes that "[t]he word was made popular on the popular social networking site StudiVZ which is considered by many as a German Facebook clone."  (emphasis of German words added) (website available at: (www.urbandictionary.com/define.php?term =gruscheln).

"Copy/Paste Innovation," see attached **Exhibit 23**, and a "Blatant Facebook Rip-Off," see attached **Exhibit 24**.

51.    One German watchdog website that has closely monitored the StudiVZ service remarks, "StudiVZ looks remarkably like an American-based social network called Facebook. The design is very similar, the order of the menu is the same, most of the style sheets have only been marginally renamed and changed from blue to red, and even the names of some of the graphic-files are copied." *See* http://www.karsten-wenzlaff.de/?p=115, also attached herein as **Exhibit 25**. Another German website has illustrated StudiVZ's theft with screenshot comparisons. *See* http://www.unfehlbar.net/index.php/studivz-ein-plagiat-als-mochtegern-youtube/, also attached herein as **Exhibit 26**.

### THE HOLTZBRINCK DEFENDANTS FINANCE, KNOWINGLY CONTRIBUTE, AID, FURTHER AND PROFIT FROM STUDIVZ'S INFRINGING BEHAVIOR

52.    On June 8, 2006, Facebook sent its first cease and desist letter to StudiVZ. The letter advised StudiVZ that it was infringing on Facebook's intellectual property and that it should immediately desist from so doing. Two months later, Defendant Holtzbrinck Ventures became a 15% equity holder of StudiVZ. Upon information and belief, Holtzbrinck Ventures learned of Facebook's allegations prior to purchasing its interest in StudiVZ.

53.    Shortly after this purchase, Defendants began a global expansion of its knockoff service. They opened dedicated StudiVZ websites in France, Italy, Spain and Poland. *See* attached **Exhibit 27**. Notably, upon information and belief, the Holtzbrinck Defendants effected this global expansion of StudiVZ's infringing activity through StudiVZ's Vice President of International Marketing, Tobias Walter, who now resides and works in North Carolina. *See* attached **Exhibit 12**.

54.    Defendants also opened Facebook knockoffs dedicated to high school students (www.schuelervz.net) and non-students (www.meinvz.net). Like the original StudiVZ websites, meinvz.net and schuelervz.net copy Facebook's non-functional elements such as look and feel, layout, column size, font, and other design elements. Instead of changing Facebook's blue color scheme for a red one, Schuelervz.net uses a pink/fuschia color scheme and Meinvz.net uses an

orange one. These websites and their dedicated color palettes further increase the likelihood that consumers will confuse the StudiVZ websites with Facebook. Consumers are likely to believe that Facebook has simply chosen to use different colors for different websites dedicated to individual markets or demographic groups, such as blue for American users, red for European users, pink for high school users and orange for non-student users. Companies often market their products in this manner, retaining the same core look and feel throughout their family of products (fonts, graphical design layout, etc.), but changing the color palette for each product so that consumers might more readily identify the product best tailored to their needs or desires.

55. In addition to copying Facebook's look and feel, the meinvz.net website is now almost entirely in English, increasing the likelihood of consumer confusion.

56. Around the same time or shortly after Defendants, backed with Holtzbrinck Ventures funds, began its global expansion of Facebook-knockoffs, Facebook sent another cease and desist letter to StudiVZ. This letter was sent on January 3, 2007. Later, on or about October 2007, Holtzbrinck Ventures' sister organization, Defendant Holtzbrinck Networks ("HNG"), became an 85% equity holder in StudiVZ. Upon information and belief, due diligence during the acquisition process revealed to the Holtzbrinck Defendants the two cease and desist letters. Armed with full knowledge of Facebook's intellectual property claims against StudiVZ, HNG nevertheless went forward with its purchase. Holtzbrinck Ventures and Holtzbrinck Networks (herein collectively referred to as the "Holtzbrinck Defendants") now owned 100% of StudiVZ and controlled and directed its efforts.

57. StudiVZ and the Holtzbrinck Defendants are wholly-owned subsidiaries of Verlagsgruppe Georg von Holtzbrinck ("VGH"). Upon information and belief, VGH's subsidiaries share management and officers. For instance, both HNG and HVG share overlapping management. *See* attached **Exhibit 28**. StudiVZ's former Vice President of Sales and current Chief Executive Officer, Dr. Clemens Riedl, was formerly an agent of VGH. *See* attached **Exhibit 29**. Further, upon information and belief, the Holtzbrinck Defendants have frequently exercised their ability to fully control StudiVZ. For instance, upon information and belief, the Holtzbrinck Defendants have often dictated the content of the StudiVZ websites, requiring

changes that would drive consumer traffic to other VGH companies and assets.

58.     The Holtzbrinck Defendants invested knowing of StudiVZ's infringement, and after obtaining operational control of the company, directed the company to stay its willfully infringing course in order to preserve its substantial investment.  Defendants continued their willful infringement knowing that it was harming Facebook in California.

59.     Defendants' behavior not only constitutes an illegal act in and of itself, but Defendants' willful disregard for Facebook's property rights has also resulted in significant harm to Facebook.  Defendants' copying of Facebook creates a high likelihood that StudiVZ's websites are being confused for Facebook's, or that users are being misled into believing there is an association between StudiVZ and Facebook.  This is especially true given the variegated color scheme of StudiVZ's websites.  As with any counterfeit product, StudiVZ's uncontrolled quality standards for service, features and privacy protection negatively impact the genuine article.  For example, StudiVZ has had numerous well-publicized data and security leaks.  Because so many aspects of StudiVZ have been copied from Facebook, users may believe that Facebook suffers from the same privacy and security flaws, when that is simply not the case.

60.     Facebook has also been hampered from entering and competing fairly in the European market by a copycat website which has misappropriated Facebook's significant investment.

61.     On information and belief, Defendants have willfully and maliciously engaged in unauthorized access to, and unauthorized appropriation of, Facebook's data, information, computers, and computers systems and networks in an attempt to copy Facebook's website and services so as to misappropriate Facebook's considerable goodwill and valuable reputation.

62.     Defendants have benefited financially from this behavior while at the same time harming Facebook.

63.     Each of the Defendants had knowledge of the other Defendants' unlawful actions and authorized and/or directed them to take the actions described in this Complaint on the other Defendants' behalf.

## DEFENDANTS' MULTIPLE CONTACTS WITH THE UNITED STATES

64.     Facebook believes, and therefore alleges, that Defendants maintain substantial and sustained contacts with both California and the United States as a whole and that they have purposefully availed themselves of the privilege of conducting activities both in California and the United States.

65.     First, Defendant StudiVZ, with knowledge that Facebook resided in California, intentionally accessed Facebook's servers for the purpose of stealing Facebook's intellectual property contained thereon. StudiVZ, first operating on its own and then later with the aid and encouragement of the Holtzbrinck Defendants, willfully infringed Facebook's intellectual property rights by developing a global network of confusingly similar websites that misled consumers as to the association between Facebook and Defendants and misappropriated Facebook's intellectual property.

66.     Second, Defendants' infringing websites have been and are being distributed in interstate commerce in the United States via the Internet. In fact, Defendants have admitted to having over 11,000 registered users of its infringing services in California alone. *See* attached **Exhibit 7**. This number is likely but a fraction of the total users that StudiVZ has across the country. Each and every one of these users maintains a profile page on one of the StudiVZ websites. Upon information and belief, like Facebook, in order to create a profile page, in order to become a StudiVZ user at all, a person must register on the site. The StudiVZ websites do far more than simply allow passive user registration. The StudiVZ registration pages (on each of its many knockoff sites) possess dynamically-created interactive prompts that are particularly geared to guide American and Californian users through their registration process. For instance, when a would-be StudiVZ user signals that she is from the United States, the StudiVZ registration page changes to include a drop-down menu that lists a number of the fifty states. *See* attached **Exhibit 30**. Upon information and belief, like anything else on a webpage, this drop-down menu was written-in by a StudiVZ computer programmer in anticipation that American users would want to register on the site.

67.     Once a user selects his or her state of residence or domicile, yet another drop down menu appears and asks users to select which university with the state the user attends.  *See* attached **Exhibit 31**.  Not all colleges or universities within a state are represented in these drop-down menus.  The selection of colleges and universities included within the registration page appears to be driven by requests from registrants to have their respective schools added to StudiVZ's site.  In other words, upon information and belief, when a student attending an American university not listed on the registration page wishes to register as a member of one of the StudiVZ websites, that student is asked to e-mail the university or college's complete name, its abbreviation, its state, city, postal code and school website to StudiVZ.  *See* attached **Exhibit 32**.  While StudiVZ webmasters are processing the request, would-be users are nevertheless permitted to register and access the site.  A student whose school does not yet appear in the drop-down menu is encouraged to register as a student from a listed university while the request is processed.  Such students are instructed to change their listing to the correct school at a later date.  Upon information and belief and StudiVZ's own websites, once a university "add request" is processed, the StudiVZ service adds that university to its permanent drop-down menu, allowing future registrants from that school to select it.

68.     For instance, on the Spanish StudiVZ site's registration page, students from the University of California at Hayward are expressly provided for.  *See* attached **Exhibit 31**.  Upon information and belief, the site received requests from students of UC Hayward to add the university to its service, which StudiVZ acquiesced to by programming Hayward permanently into its source code in order to cater and appeal to students from that university.

69.     Upon information and belief, StudiVZ has entered into Terms of Use contracts with each and every one of its over-11,000 California users and countless others throughout the United States.

70.     Upon information and belief based on StudiVZ documents freely available on the internet, StudiVZ's income model is based not on user fees (registration on StudiVZ, like Facebook, is free), but from advertisers who pay to have advertisements placed on a webpage.  *See* attached **Exhibit 33**.  The more users and "hits" a website has, the more a website is able to

charge companies wishing to advertise on the site. Upon information and belief, StudiVZ, when negotiating with advertisers, includes its California and other American users among its total number of global users. StudiVZ is thus able to charge more for its advertising space and effectively generates income from each of its American users.

71.     According to publicly available press releases, on or about September 2008, Defendant StudiVZ entered into a contractual agreement with San Jose, California-based company Panther Express. According to Panther Express, "Panther . . . now successfully serves 100 percent of StudiVZ's static content – which is projected to grow rapidly as StudiVZ grows in popularity." (http://www.pantherexpress.net/news/25/). Accordingly, it is likely that some, if not all, of StudiVZ's infringing website content is routed through website servers located in California.

72.     On or about February 2009, StudiVZ entered into a contractual agreement with Cupertino, California-based Apple, Inc. ("Apple"). Upon information and belief, StudiVZ entered into at least two contracts with Apple relating to StudiVZ's development of an iPhone cellular phone application meant to deliver StudiVZ's infringing service to Apple iPhone users. By and through these agreements, StudiVZ explicitly submitted to California law as well as to the jurisdiction and venue of this Court. Iterations of StudiVZ's iPhone application appear to further StudiVZ's theft of Facebook's intellectual property; Facebook earlier released a similar iPhone application. StudiVZ's iPhone application is available to all users of Apple's iTunes software program. iTunes is a software application used for playing, organizing, purchasing and downloading, among other things, music, videos and iPhone applications. Upon information and belief, the iTunes "Store"—where iTunes users go to purchase and download iPhone applications—is tailored to users from a particular geographic area. For instance, users logging into the iTunes store from the United States may have access to downloads that are not available in other countries and vice versa. StudiVZ's iPhone application is available for download in California and throughout the United States and is directed at garnering StudiVZ American users.

73.     Defendants' business contacts also extend to physical presence in California. For instance, upon information and belief, Defendant StudiVZ sent representatives on its behalf to the

1    Social Networking Conference held in San Francisco, California from July 26 through July 27,

2    2007.  Upon information and belief, the purpose of the visit was to network with other social

3    networking companies, to gain exposure for StudiVZ and to garner ideas for future social

4    networking developments.  Also, Defendants have, upon information and belief, sent business

5    representatives to Silicon Valley in efforts to enter into business partnerships with locally based

6    companies such as Yahoo! Inc.

7         74.    Each of the Defendants had knowledge of the other Defendants' unlawful actions

8    and authorized and/or directed them to take the actions described in this Complaint on the other

9    Defendants' behalf.

10                              **FIRST CLAIM FOR RELIEF**

11              **<u>VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT</u>**

12                                  (18 U.S.C. § 1030)

13        75.    Facebook realleges and incorporates herein by reference the allegations in

14   paragraphs 1-74.

15        76.    Defendants knowingly and intentionally accessed Facebook's computers without

16   authorization or in excess of any authorization.  Defendants were not authorized to login into and

17   use Facebook's site or services for the purpose of copying its web pages, copying its design and

18   copying its features or copying its trade dress.  Defendants were also not authorized to access

19   Facebook's computer servers beyond the terms set forth in Facebook's Terms of Use, which

20   Defendants violated by (among other things) using Facebook's servers for commercial purposes

21   without authorization.

22        77.    After gaining unauthorized access to the Facebook servers, Defendants obtained

23   and used valuable information from Facebook's protected computers in transactions involving an

24   interstate or foreign communication.

25        78.    Defendants knowingly, willfully and with an intent to defraud accessed

26   Facebook's computers without authorization or in excess of any authorization and obtained

27   valuable information from Facebook's computers, which, on information and belief, Defendants

28   used to obtain something of value.  Such valuable information includes, but is not limited to,

Facebook's webpage design and user interface.

79. Defendants' conduct has caused a loss to Facebook during a one-year period far exceeding the statutory minimum of $5,000.

80. Facebook has suffered damages resulting from Defendants' infringing conduct. Facebook seeks compensatory and punitive damages under 18 U.S.C. § 1030(g) in an amount to be proven at trial.

81. By reason of Defendants' conduct, Facebook has suffered, is suffering, and will continue to suffer irreparable harm and, unless Defendants are enjoined, the irreparable harm to Facebook will continue. Facebook has no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**

**<u>VIOLATION OF CALIFORNIA PENAL CODE SECTION 502</u>**

82. Facebook realleges and incorporates herein by reference the allegations in paragraphs 1-81 as if set forth fully herein.

83. Defendants knowingly accessed and without permission used data, computers, computer systems, or computer networks in order to wrongfully control or obtain property or data in violation of California Penal Code §502(c)(1).

84. Defendants knowingly accessed and without permission took, copied, or made use of data from a computer, computer system, or computer network, or took or copied any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network in violation of California Penal Code §502(c)(2).

85. Defendants knowingly and without permission accessed and used the Facebook services in violation of California Penal Code §502(c)(3).

86. Defendants knowingly and without permission accessed, or caused to be accessed, Facebook's computers, computer system, or computer network in violation of California Penal Code §502(c)(7).

87. Pursuant to California Penal Code §502(e)(1), Facebook seeks compensatory damages, in an amount to be proven at trial, and injunctive relief for its damages and loss suffered by Defendants' violations of Facebook's computers and network.

88. As a direct result of Defendants' actions, Facebook has suffered and continues to suffer irreparable harm for which Facebook has no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

89. Facebook is also entitled to recover its reasonable attorneys' fees pursuant to California Penal Code §502(e)(2).

90. On information and belief, Defendants actions were willful and malicious, and Facebook is therefore entitled to punitive damages pursuant to California Penal Code § 502(e)(4).

**THIRD CLAIM FOR RELIEF**

**TRADE DRESS INFRINGEMENT**

(15 U.S.C. § 1125)

91. Facebook realleges and incorporates herein by reference the allegations in paragraphs 1-90.

92. The unique look and feel of Facebook's website and services, including its graphical user interface, constitute protectable trade dress.

93. Facebook's user interface is unique, recognizable, and not merely functional.

94. Defendants have copied Facebook's trade dress in connection with goods or services in commerce in a manner likely to cause confusion or mistake, or to deceive users as to the affiliation, connection, or association of the StudiVZ websites with Facebook or as to deceive users as to the origin, sponsorship, or approval of the StudiVZ goods, services or commercial activities.

95. Facebook has been adversely affected by Defendants' violations. As a direct and proximate cause of Defendants' conduct, Facebook has sustained damages in an amount to be determined at trial.

96. By reason of Defendants' conduct, Facebook has suffered, is suffering, and will continue to suffer irreparable harm and, unless Defendants are enjoined, the irreparable harm to Facebook will continue. Facebook has no adequate remedy at law.

97. On information and belief, Defendants' actions were willful and knowing, entitling Facebook to aggravated damages in accordance with 15 U.S.C. § 7706(g)(3)(C).

- 22 -

**FOURTH CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

98.     Facebook realleges and incorporates herein by reference the allegations in paragraphs 1-97 as if set forth fully herein.

99.     By using and/or registering to use the Facebook website and service, Defendants, by themselves and/or through agents acting within their authorized scope of employment, consented to the Facebook Terms of Use, thereby entering into a valid contract with Facebook.

100.     Misappropriating Facebook intellectual property or using Facebook for a commercial purpose is in breach of the Terms of Use.

101.     Defendants' breach of the Terms of Use have proximately caused Facebook damages in an amount to be ascertained at trial.

**FIFTH CLAIM FOR RELIEF**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

102.     Facebook realleges and incorporates herein by reference the allegations in paragraphs 1-101 as if set forth fully herein.

103.     California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California.

104.     By assenting to the Facebook Terms of Use, Defendants entered into a California contract with Facebook.

105.     As a result of the actions set forth hereinabove, Defendants unfairly and improperly interfered with the plaintiff's right to receive the benefits of the Facebook Terms of Use thereby breaching the covenant of good faith and fair dealing implied in the Terms of Use, and as a result thereof, Facebook is entitled to damages as prayed.

**SIXTH CLAIM FOR RELIEF**

**TORTIOUS INTERFERENCE**

106.     Facebook realleges and incorporates herein by reference the allegations in paragraphs 1 – 105 as if set forth fully herein.

107.     California law prohibits an entity from intentionally inducing a party to a contract

1  not to perform that contract.

2      108.  Facebook's Terms of Use constitute a valid existing contract between Facebook

3  and third-party registrants to its website.

4      109.  With knowledge of this valid existing contract, Defendants intentionally and

5  knowingly induced their employees and agents to access Facebook in order to copy Facebook's

6  intellectual property or otherwise use Facebook for an unauthorized commercial purpose.

7      110.  The copying of Facebook's intellectual property or the use of Facebook for an

8  unauthorized commercial purpose breaches Facebook's Terms of Use.

9      111.  Defendants' interference has caused, is causing and will continue to cause a breach

10  of contract and/or a disruption of the contractual relationship between Facebook and Defendants'

11  agents and/or employees who have signed up for Facebook and assented to Facebook's Terms of

12  Use.

13      112.  Defendants' interference has resulted in damages to Facebook in an amount and

14  scope to be determined at trial.

15                    **SEVENTH CLAIM FOR RELIEF**

16                **CALIFORNIA COMMON LAW MISAPPROPRIATION**

17      113.  Facebook realleges and incorporates herein by reference the allegations in

18  paragraphs 1 through 112 as if set forth fully herein.

19      114.  Facebook has invested substantial time and money in the development of its trade

20  dress and other intellectual property related to the Facebook.com website.

21      115.  Defendants have acquired that trade dress and intellectual property at little or no

22  cost and have thereby and since caused injury to Facebook.

23      116.  Facebook has suffered damages as a result of Defendants' misappropriation and is

24  entitled to recover damages as prayed and in an amount and scope to be determined at trial.

25                     **EIGHTH CLAIM FOR RELIEF**

26                        **CIVIL CONSPIRACY**

27      117.  Facebook realleges and incorporates herein by reference the allegations in

28  paragraphs 1 through 116 as if set forth fully herein.

118. A civil conspiracy exists where there is a formation and operation of a conspiracy and the plaintiff suffers damage from an act or acts done in furtherance of the conspiracy's common design. Defendants have formed and operated a conspiracy for the purpose of stealing or misappropriating Facebook's intellectual property.

119. Facebook has been harmed and suffered damages as a result of Defendants' conspiracy and is entitled to recover those damages as prayed in an amount and scope to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Facebook prays for relief as follows:

1. That Defendants and their agents, servants, employees, attorneys, affiliates, distributors and any other persons in active concert or participation with them be temporarily, preliminarily, and permanently enjoined from:

      a. making any unauthorized use of, or gaining unauthorized access to, Facebook's data, information, computers, computers systems, or computer networks;

      b. encouraging or facilitating Facebook Users' violations of Facebook's Terms of Use;

      c. accessing Facebook's data, information, computers, computer systems or network, of Facebook User accounts for any reason whatsoever;

      d. maintaining websites, including social networking sites, that contain confusing or unlawfully copied anything from Facebook or Facebook's trade dress;

      e. using data or other information obtained from Facebook by improper means.

2. That Defendants be directed to file with the Court and serve upon counsel for Facebook within thirty days after entry of judgment a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the requirements of the injunction.

3. That Defendants be directed to file with the Court and serve upon counsel for Facebook within thirty days after entry of judgment a report in writing under oath setting forth in

detail an accounting of any and all sales, revenues, profit sharing or kick-back payments Defendants made, obtained or distributed as a result of their actions in violation of Facebook's rights described herein;

4.      For damages according to proof, including liquidated and statutory damages;

5.      For disgorgement of any money, property, or the value of any other economic benefit that Defendants have received as a result of their unlawful conduct;

6.      For aggravated damages;

7.      For punitive damages;

8.      For a reasonable royalty;

9.      For interest as allowed by law;

10.     For costs of suit, including reasonable attorneys' fees;

11.     For such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury for all issues which may be tried by jury.

Dated: March 31, 2009                    ORRICK, HERRINGTON & SUTCLIFFE LLP


_____
/s/ Thomas J. Gray /s/
Thomas J. Gray
Attorneys for Plaintiff
FACEBOOK, INC.

OHS West:260558998.5