# EXHIBIT B
# PART 2 OF 2

Dockets.Justia.com

Schließlich bestreitet die Beklagte, den PHP-Code der Klägerin übernommen zu haben. Dies sei zum einen kaum möglich, da es sich bei dem PHP-Quellcode um das auf den Web- und Datenbankservern des Betreibers der Webseite ablaufende Computerprogramm handele. Der Code befinde sich daher lediglich auf dem Server der Klägerin an deren Sitz in den USA, auf den die Beklagte keinen Zugriff habe noch gehabt habe. Ein Besichtigungsanspruch sei zum anderen schon deshalb abzulehnen, weil die Klägerin weder zur urheberrechtlichen Schutzfähigkeit ihres Programms vorgetragen habe noch die Indizien, die sie aufführe, den Schluss auf eine PHP-Quellcodeübernahme zuließen. Zum weiteren Vortrag der Beklagten, weshalb die seitens der Klägerin vorgebrachten Indizien nicht den Schluss auf eine PHP-Quellcodeübernahme zulassen, wird auf die S. 2-8 des Schriftsatzes vom 22.4.2009 (Bl. 1078-1084 d.A.) sowie auf das Privatgutachten Carle vom 19.4.2009 (Bl. 1093-1097 d.A.) Bezug genommen.

Wegen der weiteren Einzelheiten des Sach- und Streitstands wird auf die zwischen den Parteien gewechselten Schriftsätze nebst Anlagen Bezug genommen.

## ENTSCHEIDUNGSGRÜNDE

Die Klage ist insgesamt unbegründet.

I. Der Klägerin steht kein Anspruch auf Unterlassung der Verwendung der Bildschirmoberflächen wie aus den Anlagen A1- A4 ersichtlich zu. Ein solcher Unterlassungsanspruch ergibt sich insbesondere nicht aus den §§ 3, 4 Nr. 9, 8 UWG.

1. Auch wenn Übereinstimmungen und Ähnlichkeiten bzgl. der graphischen und funktionalen Gestaltung der Bildschirmoberflächen der Netzwerke der Parteien nicht zu übersehen sind, so liegt eine Unlauterkeit der Nachahmung im Sinne des § 4 Nr. 9 a) UWG nicht vor. Ausgehend vom Grundsatz der Nachahmungsfreiheit ist eine Nachahmung erst dann wettbewerbswidrig, wenn besondere Umstände vorliegen, die das Nachahmen als unlauter erscheinen lassen.

Unlauter handelt gem. § 4 Nr. 9 a), wer Waren oder Dienstleistungen anbietet, die eine Nachahmung der Waren oder Dienstleistungen eines Mitbewerbers sind, und er eine vermeidbare Täuschung der Abnehmer über die betriebliche Herkunft herbeiführt. Die Gefahr einer Täuschung über die betriebliche Herkunft eines nachgeahm-

ten Erzeugnisses setzt, sofern nicht Original und Nachahmung nebeneinander vertrieben werden und der Verkehr damit beide Produkte unmittelbar miteinander vergleichen kann, voraus, dass das nachgeahmte Erzeugnis eine gewisse Bekanntheit bei nicht unerheblichen Teilen der angesprochenen Verkehrskreise erlangt hat. Das Erzeugnis muss bei nicht unerheblichen Teilen der angesprochenen Verkehrskreise eine solche Bekanntheit erreicht haben, dass sich in relevantem Umfang die Gefahr einer Herkunftstäuschung ergeben kann, wenn Nachahmungen vertrieben werden (vgl. nur BGH GRUR 2007, 984 Tz 34 – Gartenliege). Entscheidend ist dabei der Zeitpunkt der Markteinführung der Nachahmung (vgl. BGH Urteil vom 9.10.2008, I ZR 126/06 - Gebäckpresse Tz 35 m.w.N.).

Im vorliegenden Fall fehlt es an der für die Herkunftstäuschung erforderlichen gewissen Bekanntheit auf dem deutschen Markt. Unstreitig ist facebook zu Beginn im Jahr 2004 nur für Studierende der Harvard Universität zugänglich gewesen. Die Öffnung erfolgte schrittweise zunächst bezogen auf Studenten und Schüler in Nordamerika und schließlich offiziell im September 2006 weltweit. Da StudiVZ bereits im November 2005 auf dem deutschen Markt angeboten wurde, kommt es darauf an, ob zum damaligen Zeitpunkt - im November 2005 - facebook bereits eine gewisse Bekanntheit auf dem deutschen Markt erlangt hatte. Eine solche ist nicht ersichtlich. Bis September 2006 richtete sich das ausschließlich in englischer Sprache gehaltene Netzwerk der Klägerin ausschließlich an nordamerikanische Schüler und Studenten. Deutsche Studenten und Schüler waren nicht bestimmungsgemäß angesprochen und stellten nicht die angesprochenen Verkehrskreise dar.

Wenn die Klägerin vorträgt, dass bereits vor der offiziellen weltweiten Öffnung im Jahre 2005 ca. 14.000 deutsche Nutzer Mitglieder von faceboook und auch internationale Schulen in einigen Ländern Europas vernetzt gewesen seien, so führt dies noch nicht zur erforderlichen Bekanntheit auf dem deutschen Markt. Die Austauschschüler sind gerade nicht als Abnehmer auf dem deutschen Markt auf facebook gestoßen, sondern haben sich als Austauschschüler während ihres Auslandsaufenthalts auf dem amerikanischen oder sonstigen internationalen Markt bei facebook registrieren können. Sie sind also als amerikanische Internetnutzer angesprochen worden und nicht als deutsche. Dass facebook bei Austauschschülern bereits vor der weltweiten Öffnung im September 2006 bekannt gewesen sein mag, kann daher keine Bekanntheit bei nicht unerheblichen Teilen der angesprochenen Verkehrskreise auf dem deutschen Markt begründen.

Der Klägerin kann auch nicht eine eventuelle Bekanntheit in anderen europäischen Ländern zugute kommen. Es kann dahinstehen, ob einige internationale Schulen in

Europa bereits 2005 mit facebook vernetzt waren. Der ausländische Wettbewerber mag zwar Gleichbehandlung genießen. Das ändert jedoch nichts daran, dass er auch die nach inländischem Recht erforderlichen Tatbestandsmerkmale erfüllen muss (vgl. BGH a.a.O. – Gebäckpresse Tz. 35). Mangels Bekanntheit auf dem deutschen Markt zum Zeitpunkt der Markteinführung von StudiVZ kommt der Unlauterkeitstatbestand der vermeidbaren Herkunftstäuschung nicht in Betracht.

Der Vortrag, dass bereits vor der offiziellen Öffnung über Einladungen auch deutsche Schüler und Studenten bei facebook registriert werden konnten, ist – was die Bekanntheit auf dem deutschen Markt anbetrifft – nicht hinreichend substantiiert. Es ist nichts dazu vorgetragen, wie viele deutsche Nutzer, die nicht Austauschschüler/-studenten oder an bereits vernetzten internationalen Schulen bzw. Universitäten aufgenommen waren, im Herbst 2005 aufgrund von Einladungen bei facebook registriert worden sind. Im Übrigen wäre auch diese Möglichkeit der Registrierung kein an den deutschen Markt gerichtetes Angebot, sondern ein um vereinzelte deutsche Mitglieder erweitertes Angebot auf dem amerikanischen Markt.

2. Ein Unterlassungsanspruch aus § 4 Nr. 9 b) UWG kommt ebenfalls nicht in Betracht. Als unlauter gilt nach § 4 Nr. 9 b) UWG eine Nachahmung auch dann, wenn der Nachahmer die „Wertschätzung der nachgeahmten Ware oder Dienstleistung unangemessen ausnutzt oder beeinträchtigt". Die setzt voraus, dass das Originalprodukt eine „Wertschätzung" genießt. Dies wiederum setzt eine gewisse Bekanntheit voraus, die jedoch – wie bereits ausgeführt – nicht festgestellt werden kann.

3. Eine Unlauterkeit wegen unredlicher Erlangung von Kenntnissen oder Unterlagen im Sinne des § 4 Nr. 9 c) UWG ist nicht substantiiert vorgetragen.

a) Wenn die Klägerin behauptet, dass die Beklagte ihren PHP-Quellcode auf illegale Weise erlangt habe, so stellen sich diese Behauptungen als bloße Vermutungen dar. Dazu, wie die Beklagte an den geheimen, sich allein auf dem Web- und Datenbankserver der Klägerin befindlichen PHP-Quellcode gelangt sein soll, hat die Klägerin nicht substantiiert vortragen können. Der allgemeine Hinweis auf die Schwierigkeiten, sich vor Hackern und sonstigen rechtswidrigen Zugriffen zu schützen, oder der Hinweis auf Sicherheitslücken wie die aus dem Jahr 2007, genügen nicht, der Beklagten unredliche Kenntniserlangung vorzuwerfen.

b) Auch bezogen auf die Webseiten und die sichtbaren Inhalte steht der Klägerin kein Anspruch aus §§ 3, 4 Nr. 9c), 8 UWG zu. Die Klägerin stützt ihren Anspruch darauf, dass einer der Gründer der Beklagten während seines Amerikaaufenthalts

als Praktikant Mitglied von facebook geworden war und sich so die Kenntnisse über facebook verschafft habe.

Nach § 4 Nr. 9 c) UWG handelt unlauter, wer die für die Nachahmung erforderlichen Kenntnisse oder Unterlagen unredlich erlangt hat. Der Begriff der Unredlichkeit erfasst zunächst alle Formen der strafbaren Erlangung von Kenntnissen und Unterlagen (BGH GRUR 2003, 356, 357 – Präzisionsmessgeräte). Dazu gehören die Tatbestände der §§ 17, 18 UWG, mit denen andere Straftatbestände konkurrieren können (Hefermehl/Köhler/Bornkamm, UWG, 27. Aufl. § 9 Rn. 9.61). Da es sich bei den jedem registrierten Nutzer von facebook zugänglichen Webseiten weder um Geschäfts- oder Betriebsgeheimnisse handelt noch um im geschäftlichen Verkehr anvertraute Vorlagen oder Vorschriften technischer Art, sind die Tatbestände der §§ 17, 18 UWG nicht erfüllt.

Unredlich erlangt sind Kenntnisse oder Unterlagen zwar auch dann, wenn ihre Mitteilung oder Wiedergabe durch Täuschung bewirkt wurde oder unter Vertrauensbruch missbräuchlich zur Nachahmung ausgenutzt wurden (Hefermehl/Köhler/Bornkamm, a.a.O. § 9 Rn. 9.62). Aber auch diese Voraussetzungen liegen nicht vor.

Zunächst durfte sich auch der Gründer der Beklagten grundsätzlich als Mitglied bei facebook registrieren. Dass er dies als Praktikant eines Geschäftspartners während seines Aufenthalts in den USA getan hat, ändert nichts daran, dass er einfaches Mitglied bei facebook war. Die Informationen über das Aussehen, die Funktionalitäten etc. hat er im Rahmen seiner legitimen Mitgliedschaft in Erfahrung gebracht, so dass ein unlauteres in Besitz bringen nicht vorliegt. Für die Frage des Vertrauensbruchs ist nämlich stets zu fragen, ob die sonst nicht ohne weiteres zugänglichen Kenntnisse oder Unterlagen für die Herstellung und Vermarktung der Erzeugnisses gerade aufgrund des Vertrauensverhältnisses zugänglich gemacht wurden (Hefermehl/Köhler/Bornkamm, a.a.O. § 4 Rn. 9.62). Die Webseiten der Klägerin waren jedoch allen Studenten in den USA zugänglich, da allein die Registrierung ausreichte. Es handelt sich damit nicht um „nicht ohne weiteres zugängliche Kenntnisse oder Unterlagen". Dass dem Gründer von facebook aufgrund seiner Eigenschaft als Praktikant eines Geschäftspartners von facebook gerade wegen der Geschäftsbeziehungen besondere Informationen über facebook zugänglich gemacht worden wären, ist nicht vorgetragen.

4. Auch der Anspruch auf Unterlassung wegen unlauterer Behinderung gem. § 4 Nr. 9 UWG ist unbegründet.

a) Die Klägerin behauptet zwar, dass sie durch die Markteinführung der Nachahmung behindert worden sei. Eine unlautere Behinderung ist dann anzunehmen, wenn dem Schöpfer des Originals durch das Anbieten der Nachahmung die Möglichkeit genommen wird, sein Produkt in angemessener Zeit zu vermarkten (Hefermehl/Köhler/Bornkamm, UWG, 27. Aufl. 2009, § 4 Rn. 9.64).

Auch wenn die Entwicklung bei facebook in Deutschland besonders schleppend vorangegangen sein sollte, ist eine Behinderung durch die Beklagte nicht ersichtlich. Hierbei ist zu berücksichtigen, dass die Klägerin zunächst im September 2006 nur mit einer englischsprachigen Version auf den deutschen Markt eingeführt wurde. Die deutschsprachige Version von facebook existiert erst seit März 2008. Die jüngere positive Entwicklung zeigt, dass facebook sich nunmehr auch auf dem deutschen Markt etabliert hat. Dass die Startschwierigkeiten gerade auf die Existenz der Beklagten in ihrer nachgeahmten Gestaltung und nicht etwa auf sprachliche bzw. kulturelle Barrieren zurückzuführen sind, ist nicht hinreichend dargetan.

Selbst wenn man mit der Klägerin davon ausgeht, dass der durchschnittliche deutsche Student oder Schüler der englischen Sprache mächtig ist, handelt es sich bei einem Sozialen Netzwerk doch um eine Einrichtung, bei der es um Vermittlung von privaten Informationen und Gedanken und um das Finden von neuen bzw. Auffinden von alten Freunden geht. Dass deutsche Nutzer die englische Sprache derart beherrschen, dass sie gewillt sind, die auf einem Sozialen Netzwerk üblicherweise stattfindende Kommunikation in englischer Sprache zu führen, erscheint wenig naheliegend. Auch wenn es sich nicht um sprachlich anspruchsvolle Mitteilungen handelt, erscheint es erforderlich, dass man sich in einer Sprache wohl fühlen und sich zwanglos mitteilen können muss. Dass dies bei dem durchschnittlichen deutschen Studenten oder Schüler gegeben ist, davon kann nicht ohne weiteres ausgegangen werden. Nachvollziehbare Belege für ihre anderweitige Behauptung hat die Klägerin nicht vorlegen können.

Schließlich ist ein Netzwerk, das zunächst nur an nordamerikanische Studenten und Schüler adressiert war, auch in Bezug auf das Finden neuer und insbesondere Auffinden alter Freunde für deutsche Nutzer von wenig Interesse. Vor diesem Hintergrund ist der Vortrag der Klägerin zur Behinderung durch StudiVZ nicht hinreichend substantiiert.

b) Eine Behinderung wegen systematischer Nachahmung einer Vielzahl von Erzeugnissen ist ebenfalls nicht gegeben. Die Klägerin behauptet, dass die Beklagte seit Jahren systematisch fast alle Funktionalitäten bei facebook nach und nach über-

nommen habe. Grundsätzlich kann der systematische Nachbau behindernd sein (siehe BGH GRUR 1996, 210 ff. – Vakuumpumpen). In dem vom BGH entschiedenen Fall handelte es sich jedoch um technische Produkte, deren technisch-funktionale Gestaltungselemente frei wählbar waren. Vorliegend geht es indessen nicht um die Nachahmung einer Vielzahl von Erzeugnissen, sondern um die Nachahmung einer Vielzahl von bestimmten Funktionalitäten eines Sozialen Netzwerks. Diese Funktionen sind zwar frei wählbar; letztlich geht es jedoch um die Idee einer bestimmten Funktion. Ideenschutz wird von § 4 Nr. 9 UWG nicht gewährt. Der lauterkeitsrechtliche Nachahmungsschutz bezieht sich immer nur auf die konkrete Gestaltung eines Erzeugnisses, nicht auf die dahinter stehende abstrakte Idee. Entsprechendes gilt für sonstige allgemeine Gedanken oder Lehren, wie z.B. einen bestimmten Stil, eine bestimmte Technik oder Methode (Hefermehl/Köhler/Bornkamm, UWG, 27. Aufl. § 4 Rn. 9.23 m.w.N.).

II. Ein Unterlassungsanspruch aus § 14 Abs. 5, Abs. 1 MarkenG ist ebenfalls unbegründet. Die Bildmarke der Klägerin, die aus der Abbildung von graphischen Elementen ihrer Webseite besteht, ist zwar grds. kennzeichnungskräftig. Die Marke der Klägerin wird von der Beklagten jedoch nicht markenmäßig verwendet.

Der Begriff des kennzeichenmäßigen Gebrauchs wird von der Rechtsprechung als im Interesse eines umfassenden Kennzeichenschutzes grundsätzlich weit zu fassen bezeichnet. Es genügt die objektive, nicht völlig fernliegende Möglichkeit, dass der Verkehr einen Herkunftshinweis annimmt (vgl.Ingerl/Rohnke, MarkenG, 2. Aufl. § 14 Rn. 102 m.w.N.). Dass der angesprochene Verkehr in dem Layout der Webseite der Beklagten trotz bzw. neben dem sichtbaren Logo „StudiVZ" einen Herkunftshinweis sieht, erscheint jedoch fernliegend. Der Verkehr erwartet in der Regel nicht, dass die graphische Darstellung einer Webseite einen Hinweis auf die Herkunft der Dienstleistung darstellen soll. Das Aussehen und die Gestaltung einer Webseite haben aus Sicht des Verkehrs neben funktionalen Gründen stilistische oder ästhetische Gründe. Dass der Aufbau und das Aussehen einer Internetseite einen Hinweis auf die Herkunft darstellen, käme allenfalls dann in Betracht, wenn die Ausgestaltung in besonderer Weise auffällig wäre.

Die graphische Gestaltung der Marke bzw. der Bildschirmoberfläche von StudiVZ weisen indes keine auffälligen Besonderheiten auf, sondern sind gerade möglichst schlicht gehalten und an den Funktionalitäten orientiert. Zwar kann gerade auch eine schlichte Darstellung auffällig und damit dem Grundsatz nach herkunftshinweisend sein. Im vorliegenden Fall – in welchem der Verkehr keine herkunftshinweisende Funktion erwartet und ein Logo sichtbar platziert ist – reicht die Schlichtheit der Ge-

staltung nicht aus, um eine markenmäßige Nutzung zu bejahen.

III. Der Klägerin steht auch kein Anspruch aus §§ 97 Abs. 1, 69a UrhG zu. Ihr Vortrag zu der von ihr behaupteten PHP-Quellcodeübernahme stellt sich als nicht hinreichend substantiiert dar. Deshalb hat die Klägerin zusätzlich einen Antrag auf Besichtigung gem. § 101a Abs. 1 S. 1 UrhG gestellt.

Ein Anspruch auf Besichtigung ist jedoch ebenfalls unbegründet. Die Klägerin hat die hinreichende Wahrscheinlichkeit einer Quellcodeübernahme – wie sie nach § 101a Abs. 1 S. 1 UrhG erforderlich ist – nicht dargetan. Nach § 101a Abs. 1 S. 1 UrhG kann, wer mit hinreichender Wahrscheinlichkeit das Urheberrecht eines anderen widerrechtlich verletzt, von dem Verletzten auf Besichtigung einer Sache in Anspruch genommen werden. Die von der Klägerin vorgetragenen Indizien stellen sich als Vermutungen dar, sie weisen jedoch nicht mit hinreichender Wahrscheinlichkeit auf eine widerrechtliche Quellcodeübernahme hin. Die meisten Indizien wie die äußeren Ähnlichkeiten, Identität der Funktionen, Übereinstimmungen im HTML-Text und in der Benennung von Dateien führen nicht zu dem Schluss, dass der PHP-Quellcode übernommen wurde, sondern diese Übereinstimmungen und Identitäten können auch darauf beruhen, dass die Gründer der Beklagten – was unstreitig ist – die Webseiten der Klägerin kannten und diese mit Hilfe der sichtbaren Informationen in Anlehnung an die Seite der Klägerin nachprogrammiert haben bzw. haben lassen.

Davon ist auch die Klägerin, die seit Jahren Kenntnis von den Ähnlichkeiten in Aufbau, Aussehen und Funktionen hat, bislang selbst ausgegangen. Dass sie nunmehr annimmt, dass nicht nur eine Nachprogrammierung, sondern eine PHP-Quellcodeübernahme stattgefunden haben muss, beruht nicht auf weiteren, neuen Indizien, sondern sie stützt diese Annahme hauptsächlich auf die Ergebnisse der von ihr im Jahre 2008 beauftragten Privatgutachten. Diese kommen zu dem Ergebnis, dass eine Quellcodeübernahme wahrscheinlich ist, weil - wie in den Gutachten im einzelnen dargelegt – neben den Übereinstimmungen im Aussehen, Aufbau und Funktionalitäten u.a. identische Dateinamen, identische Dateiabfolgen und nahezu identische Stylesheets verwendet wurden und insbesondere Auskommentierungen im HTML-Code vorhanden sind. Äußere Anhaltspunkte wie etwa ein Mitarbeiterwechsel liegen nach wie vor nicht vor.

Die Privatgutachten der Klägerseite setzen sich jedoch nicht mit der Situation eines Programmierers auseinander, der die Aufgabe gestellt bekommt, anhand der bereits in den USA zugänglichen Webseite der Klägerin eine entsprechende Webseite in deutscher Sprache zu programmieren. Diese Situation unterstellt, sind die Ähnlich-

kelten und Übereinstimmungen in Aufbau, Aussehen und Funktionen nicht verwunderlich, sondern naheliegend. Wenn einem Programmierer die Aufgabe gestellt wird, anhand der Seite der Klägerin und deren öffentlich zugänglichen HTML-Texten und Stylesheets eine identische Seite lediglich in deutscher Sprache zu erstellen, wäre es fernliegend, dass der Programmierer sich nicht die sichtbaren Teile zunutze macht, sondern dazu übergeht, alle Dateinamen und Abläufe neu zu erfinden. Die Schwäche der Privatgutachten der Klägerin liegt darin, dass sie nur zwei Möglichkeiten berücksichtigen. Sie unterstellen einmal die Situation eines Programmierers, der ohne jegliche Vorgabe und ohne Kenntnis von facebook ein Soziales Netzwerk neu erschafft und einmal die Situation eines Programmierers, dem der PHP-Quellcode zur Verfügung steht. Die Gutachten berücksichtigen nicht und nehmen daher keine Stellung dazu, wie es sich verhält, wenn einem Programmierer seitens der Beklagten die konkrete Aufgabe der Nachprogrammierung etwa unter Nutzung der Webseiten, der HTML-Texte und Stylesheets der Klägerseite gestellt wurde. Eine solche Aufgabenstellung würde die Übereinstimmungen in Namen, Aussehen und Funktionen erklären. Sie würde auch die Verwendung der Bezeichnung „poke" sowie eines Dateinamens „fakebook" erklären.

Selbst die Auskommentierungen im HTML-Text lassen nicht den Schluss auf einen PHP-Quellcodediebstahl zu. Unterstellt man eine Nachprogrammierung unter Zuhilfenahme aller öffentlich zugänglichen Informationen bzgl. facebook, liegt es nahe, dass bestimmte Funktionen, die die Klägerin integriert hatte, von der Beklagten zunächst nicht angeboten werden sollten. Die Auskommentierungen können vorgenommen worden sein, wenn die Beklagte die nachprogrammierten Funktionen, die auf der Seite der Klägerin vorhanden waren, zunächst nicht anbieten, sich aber die Option einer späteren Anwendung vorbehalten wollte. Dass dies eine Erklärung für das Vorhandensein von Auskommentierungen im HTML-Code sein kann, ist vom Sachverständigen Carle bestätigt und von den Sachverständigen Streitz als Möglichkeit nicht ausgeschlossen worden.

Anders als in dem vom BGH (GRUR 2002, 1046-1049 - Faxkarte) entschiedenen Fall gibt es neben den Ähnlichkeiten, die das Programm selbst betreffen, keinen weiteren außerhalb des Programms liegenden Anhaltspunkt, der für eine Quellcodeübernahme sprechen würde. Dem BGH reichten im o.g. Fall für eine gewisse Wahrscheinlichkeit nach § 809 BGB die zahlreichen Übereinstimmungen der Programme verbunden mit der Möglichkeit, dass das Programm über den früheren Mitarbeiter des Verletzten zum Verletzer gelangt ist. Übereinstimmungen der Programme können daher allein nicht genügen. Mehr hat die Klägerin jedoch nicht vorgetragen. Die Klägerin beschränkt sich hinsichtlich der Möglichkeit der Kenntniserlangung durch

die Beklagte auf bloße Vermutungen wie allgemeine Sicherheitslücken, ohne im Detail vorzutragen, ob ihr konkret Sicherheitslücken, und zwar solche, die über Jahre hinweg immer wieder aufgetreten sind, bekannt sind. Da nach ihrem eigenen Vortrag immer wieder über Jahre neue Funktionalitäten übernommen worden sind, müsste daher jahrelang immer wieder auf ihren PHP-Code zugegriffen worden sein. Sie hat jedoch nichts dazu vorgetragen, wie eine Übernahme des allein auf ihrem Server liegenden Quelltextes möglich gewesen sein soll, welche Sicherheitsmaßnahmen sie eingerichtet hat, die dennoch ständig überwunden werden konnten.

Die Ähnlichkeiten der sichtbaren Teile der Programme sowie die Auskommentierungen allein, die auch auf nachschaffende Nachprogrammierung beruhen können, lassen für sich betrachtet nicht auf eine hinreichende Wahrscheinlichkeit einer Quellcodeübernahme schließen.

IV.
Der Antrag auf Feststellung eines gesonderten Schadensersatzanspruchs gem. § 280 BGB wegen Verstoßes gegen die AGB von facebook durch einen der Gründer der Beklagten ist ebenfalls unbegründet, da die Beklagte selbst nie Vertragspartner der Klägerin war.

V.
Die prozessualen Nebenentscheidungen beruhen auf §§ 91 Abs. 1, 709 S. 1, 2 ZPO.

Streitwert: 1.000.000,-- €

Dr. Schwitanski        Wuttke          Chang-Herrmann
                       urlaubsbedingt an der
                       Unterschriftsleistung
                       gehindert

```
×  ×  ×  SENDEBERICHT ( 19. JUN. 2009 11:51 )  ×  ×  ×

               FAX HEADER:   HEYMANN & PARTNER     EIGENER NAME:  HEYMANN & PARTNER

GESENDET/ABGESPEICHERT : 19. JUN. 2009 11:43
DAT. MODUS      OPTION          ADRESSE                        ERGEBN.        SEITE
836  SPEICHER SENDEN            002217711600                   OK             18/18

FEHLERURSACHE
E-1) ÜBERTRAGUNGSFEHLER                          E-2) BESETZT
E-3) KEINE ANTWORT                               E-4) KEINE FAX-VERBINDUNG
```

# heymann

Heymann & Partner Rechtsanwälte · Taunusanlage 1 · 60329 Frankfurt am Main

Oberlandesgericht Köln
Reichenspergerplatz 1
50670 Köln

Vorab per Telefax: 0221 / 7711-600

Heymann & Partner
Rechtsanwälte

Taunusanlage 1
60329 Frankfurt am Main

T: +49-69-768 063 - 0
F: +49-69-768 063 - 15
E: info@heylaw.de

www.heylaw.de

Dr. Friedrich Klinkert
Thomas Heymann
Adi Seffer
Dr. Katharina Scheja
Prof. Dr. Jens Ekkenga
Dr. Lars Lensdorf
Dr. Sabine Pittrof
LL.B. (Univ. N.S.W.)
Titus Walek
Dr. Andreas Müller-Driver
LL.M. (Georgetown),
Attorney-at-Law (N.Y.)
Dr. Henning Bloß
LL.M. (London)
Piet Bubenzer
Walter Born
Fachanwalt für Arbeitsrecht
Nora Keßler
Eva Prinz
Dr. Peter Gumnior

Unser Zeichen: 0249.002 KS/CMW
(bitte bei Antwort angeben)

19. Juni 2009

## Berufung

der Facebook Inc., 471 Emerson Street, CA 94301-1605 Palo Alto, USA, vertreten durch ihre Board-Mitglieder Mark Zuckerberg, Jim Breyer, Peter Thiel und Marc Andreessen,

- Klägerin und Berufungsklägerin -

Prozessbevollmächtigte:   Rechtsanwälte Heymann & Partner,
                          Frau Rechtsanwältin Dr. Katharina Scheja,
                          Taunusanlage 1, 60329 Frankfurt am Main

gegen

die StudiVZ Ltd., Saarbrücker Straße 38, 10405 Berlin, vertreten durch ihre Geschäftsführer Markus Berger-de-Léon und Dr. Clemens Riedl,

- Beklagte und Berufungsbeklagte -

Prozessbevollmächtigte:   I. Instanz: Rechtsanwälte CMS Hasche Sigle,
                          Herr Rechtsanwalt Dr. Klaus Ikas,
                          Schöttlestraße 8, 70597 Stuttgart

Az. I. Instanz: 33 O 374/08

Heymann & Partner Rechtsanwälte · Partnerschaftsgesellschaft · Sitz Frankfurt am Main · AG Frankfurt am Main PR 1937